Walter Pierce, Frank Pierce and James B. Pierce, trading as Sharpsville Furnace Company *v.* The Allegheny Bessemer Steel Company, Appellant.

[Marked to be reported.]

*Contract—Sale—Acceptance of goods—Evidence.*

In an action to recover the price of iron, a verdict and judgment for the plaintiff will be sustained where the evidence tended to show that the iron was to be paid for, one half on the 10th of the month, and the balance on the 25th; that on the 10th of the month defendant charged itself with all of the iron, but on the 25th, in a statement to the commission merchants who sold it, it took credit for the payment already made, alleging that the iron had an excess of sulphur beyond what the contract of sale specified, and no notice that any of the iron had been rejected for any reason whatever was given to the plaintiffs for nearly four months, when a chemical analysis was sent to them.

Argued Oct. 26, 1897.    Appeal, No. 45, Oct. T., 1897, by defendant, from judgment of C. P. No. 2, Allegheny County, April T., 1894, No. 340, on verdict for plaintiffs.    Before STERRETT, C. J., GREEN, WILLIAMS, MCCOLLUM, MITCHELL, DEAN and FELL, JJ.    Affirmed.

Assumpsit to recover the price of pig iron sold and alleged to have been accepted by the defendant.    Before MAGEE, J.

The court charged as follows:

This is an action of assumpsit brought February 6, 1894, by the plaintiffs, to recover from the defendant the sum of $5,454.52, with interest from November 1, 1890, for three hundred and forty tons of Sharpsville high sulphur Bessemer pig iron, at the price of $16.00 per ton, f. o. b. cars at Cochran station, Pa., terms of payment to be one half on the 10th and one half on the 25th of the month succeeding delivery, the iron to contain silicon not over two per cent (but that is not important because there is no dispute about the silicon) and sulphur not over .120. The following is a copy of the writing upon which the parties to this action were dealing with one another in the sale and purchase of the iron in dispute, connected also with some other iron not in dispute:

"Sale memorandum.   Nimick & Co., pig iron and blooms, 96 Water street, Pittsburgh, Pa., October 18, 1890.   Allegheny Bessemer Steel Co., Pittsburgh, Pa.   Dear Sir:—We have entered your order for 600 tons, more or less, Sharpsville high sulphur pig iron, delivery immediately.   Price $16 per ton, f. o. b. Cochran, Pa.   Terms, cash ½ 10th and ½ 25th of the month succeeding delivery, to be shipped to Cochran, Pa., subject to possible delay from accidents, strikes or other unavoidable causes," and signed "Yours truly, Nimick & Co., per Scott." That was the witness Scott who was examined in the case. "In addition to the above, we will ship to you the balance of same kind of iron due on our contract with William Clark's Sons & Co., about 250 tons, silicon not over 2 per cent., sulphur not over .120 per cent."

Nimick & Company were metal brokers, and were acting as the agents of the plaintiffs in the sale.   The Sharpsville Furnace Company, the plaintiff, acting upon the order of their agent, shipped to the Allegheny Bessemer Steel Company the iron called for by the order, at least there is no dispute or evidence that it was not so forwarded.   A portion of the iron shipped between October 21 and 31, 1890, both days inclusive, as testified to by Mr. Grey, amounting to three hundred and forty tons, and contained in thirteen cars, the numbers of which are : 3087, 9149, 3912, 9058, 1029, 324, 6527, 7754, 7658, 1620, 678, 1296, and 816, has not been paid for and has given rise to this action. I give these car numbers because the analyses are all connected with the numbers of the cars.

[On November 25, 1890, the day designated for the full payment for all the metal shipped on the order, a partial payment having been made on November 10, the defendant company declined to pay for the metal in dispute, on the ground, as I assume from the evidence presented, that it was defective in quality and did not come up to the specifications upon which the same had been ordered, and was wholly unfit to be used in the manufacture of steel rails, for which purpose the defendant used iron, and which was known to the plaintiffs.   I leave to you the question of whether that refusal was presented prior to the bringing of this suit.   If that fact becomes material, you will determine when that notification was given to either Nimick & Company or the Sharpsville Furnace Company.] [1] The

defendant says that it gave notice on the 25th to Nimick & Company of the rejection of the iron in dispute, for the reasons stated, and made settlement for the rest of the iron furnished. I am trying to give you what are the undisputed facts in the case. It is for you to determine what effect they may have upon the construction of their contract. This state of facts raises the main issue to be tried in this action—although there are other issues—whether it was accepted, or whether it was rejected, or whether it was rejected in time, or under proper conditions, are other questions ; but the main question that has been raised with reference to this suit is, was the iron in dispute of the quality contracted for and delivered in cars at Cochran station? There is no dispute of the fact that the quantity of iron was delivered on cars at Cochran station, so that the principal issue, in my judgment, to be determined, is that of the compliance with the terms of the contract, or whether under the contract and the circumstances connected therewith, the defendant company had the right to reject the iron for the reasons assigned, that it was not of the quality contracted for.

The contract calls for iron not to contain of sulphur more than .120. The question of the limit of sulphur is definitely fixed not to exceed .120. How the amount of sulphur in the iron is to be determined is not set forth in the order or contract—we will call it a contract—but the evidence seems to have admitted of tests by both buyer and seller to determine by analysis the quantity of sulphur in the iron. The evidence would indicate to my mind, though it need not necessarily do so to yours, that it was not the intention of the parties that each pig of iron was to be submitted to analysis. Judging from their action in the premises, the custom was to take one or more pigs from the furnace to start with, or from the cars, from which was to be ascertained the character and quality of the iron. No one anywhere in the controversy undertook to say that the meaning of that contract was that there was to be analysis of each pig. It was to be either by lots in some form or another, by a car load, or the lot altogether, and that is the question that is before you, I think. [It is not a question as to whether they were to furnish iron with sulphur not exceeding .120. That is admitted under the agreement, but how was it to be determined, and what did that mean in the subsequent dealings of the parties? That ques-

tion, I say, is for you.] [2] The evidence before you is that both parties to this litigation adopted that course. At the furnace, two or three or some reasonable number of pigs were taken from each cast (I needn't say to you what a cast was. It was the run of the furnace), and analyzed, piled in the yard, marked with data on the pile, by which the analysis was known, and shipped according to the analysis given in records kept by the chemist at the furnace. Now that is what they say they did. When the iron reached Cochran station, the defendant company took from the cars one or two or more pigs, as it deemed requisite for its purpose, and made its analysis therefrom, and kept a record of the same, as made by its chemist, with the car numbers designated.

This mode adopted by both parties would seem to indicate as the understanding of the parties that the analysis so made was the anticipated manner in which the quality of the iron in lots was to be ascertained; in other words, that any other way was impracticable, and was not to be required in the construction of the contract, which had been entered into. Do not take anything from me on the facts, however. You will find the facts yourself from the evidence, and the inferences you draw for yourself from the facts presented. You must not take them from me or from counsel unless the inferences seem reasonable to you or accepted as reasonable.

Now let me say a little about the evidence, although I am not going into it, because you have had a very elaborate argument on the controversy, and have heard all the letters and other papers read. You have on the part of the plaintiffs the evidence of an analysis of the iron made at the furnace, the manner in which it was made, and the identification of the iron piled in the yard, and its subsequent shipment on board cars. You have got that evidence, and you will recall what it is with the aid counsel has given you in the way of refreshing your memory. [The analysis given for the thirteen cars has been given in detail, that is, of the sulphur contents of the iron, and I will not give that in the case of the plaintiffs' testimony, because it is all with one or two exceptions below .120, the standard that was fixed by the contract. I say that in so far as I recall the evidence, the different analyses made by the plaintiffs' chemist, with a few exceptions, show the sulphur not in excess

of .120.   So if the analyses made by Mr. Barris, Mr. Trautvetter and Dr. Wuth are to be accepted as correct under the contract, and the mode that was adopted by which was to be determined the quality of the iron, then there will be no ground, I take it, for the rejection of the entire iron solely for the reason that it contained more sulphur than had been contracted for, for if the results of their analyses is to be taken as true, they show but one or two cars in which the sulphur exceeds .120, and not to a very great extent.]   [3]   That is the general character of the testimony of the chemists on the part of the plaintiffs.   The results of their analyses show in three instances but few cars, perhaps one or two, in which the sulphur exceeded the limit fixed.   Of course under their contracts it did not require that they should furnish iron just up to that limit in sulphur.   They could furnish it at all the standard required for the manufacture of Bessemer steel if they saw proper to do it.   They were not limited except that they could not go above .120.   They could go below it if they wanted to.   That is a general statement of what I think is all that is necessary for me to mention in connection with this branch of the question, of a test of the quality of the iron.   Three men have said that they took the test ordinarily adopted in cases of this kind, taking one, two or three pigs in a lot, without selection at all, but with a view to determining the question of the quality, and these three men testify what is the result and give you the details.   [I do not give you the details, but simply say that the general result of their testimony is that it came substantially within the requirements of the contract as to the quantity of sulphur contained in the iron.]   [4]

Now, I will say a few things with reference to the defendant's side of the case.   In answer to the plaintiffs' evidence the defendant has offered different analyses made by a number of chemists, four I think in number.   Mr. Camp, the chemist of the defendant company, made an analysis by car numbers as they arrived, or within a day or two thereafter, that is the way I recall his testimony as to the time the analyses were made by him, and he said he also made one on June 4, 1895.   The first analysis was of two samples taken from the car, and taking the average of the two samples, only three cars appeared below .120. The others ran: one car .129, another .137—I mean of the average of the two samples taken.   He has given both, but I have

taken the average—.153, .132 from two samples, .121, .151,
.153, .123 and .148. That which I have given you is the analy-
sis made at the time the car arrived. His analyses of June 4,
1895, was of six samples in some cases and three in others, and
the averages by samples from the cars analyzed were as follows:
.042, .176, .108, .125, .133, .152, .125, .090, .092, .113, .077, .091,
.169. Those are the averages according to his testimony, as
appeared by the cars. You will see that quite a number of them
run beyond the limit of .120 and quite a number run below.
Now, I have taken the average. I don't say this is the proper
average to be taken, but I say it is a question that belongs to
you as to the matter of what is the average to be given.

There is an average of some kind considered as a proper one
for the determination of the sulphur in that iron, because they
are all taking different samples, and they say that one piece will
not determine it, but in some way an average is to be obtained.
Is that average by the car or by the quantity? [Now, accord-
ing to this testimony of Mr. Camp, a majority, perhaps, of the
cars, show a percentage of sulphur greater than .120, but if
you take the average of all the cars, it is .115, which is below
the standard required. Now, which is right? Under all the
evidence and the contract that you find there in writing, how
was it to be carried out, and what does it mean? Does it mean
the lot of iron that was shipped, or by car lots?] [5] [It clearly
does not mean by pigs, because nobody is contending for that.
Does it mean by car lots as contended for by the defendant, or
does it go to the extent that has been contended for by the
plaintiffs' counsel, the entire lot, and if it does mean the entire
lot, does it make it what the defendant contends it does, a non-
homogenous mixture, and that, therefore, and in that way it is
not a fair compliance with the terms of their agreement? Now,
that is Mr. Camp's testimony, and it just depends upon which
way you take his view. By the whole lot it makes a less per-
centage, and by the cars it makes a higher.] [6] Mr. Handy
made an analysis of three samples from each car, and I think he
mixed them, he didn't analyze each pig of the three, but took
drillings from each and mixed them up, and then gave what he
regarded as the average of those three, and his results did not
differ materially from those of Mr. Camp's. There is a little
variation, but there is not one solitary chemist whose analysis

agrees with another straight through, even where the analysis was made from identically the same article, as in the case of Dr. Wuth or some other chemist who had something left over from a drilling that was taken out by another chemist, but there is none of them that agree, and that would seem to indicate the very difficulty in getting at what would be the meaning of that contract, how it is to be determined, because you will find variations in their analyses on the same articles from twenty to thirty or ten thousandths of a difference. [Mr. Handy's average for the entire cast, as I have said, is a little higher in sulphur than Mr. Camp's. If my addition is correct, Mr. Handy's averages, taking the entire lot, would be just .120. It just comes out that way according to my calculation.] [7] I have referred to the analyses made by three chemists who testified on behalf of the defendant. Two other chemists, Mr. Johnson and Mr. Gaurigues, gave their analyses of the iron. All the chemists differ somewhat in their results, and naturally enough, too, when they all use different pigs. I have only referred somewhat in detail to the analyses of two of these—two for the defendant and three mentioned casually on the part of the plaintiffs. I did not discuss the testimony of the chemists of the plaintiffs so much in detail, inasmuch as they have made their analyses, with but very few exceptions, below the .120 in sulphur, and for that reason I did not think it was necessary to go into it in the same extent as on the part of the defendant.

What I have said in regard to the analyses of the iron has relation to the rejection of the iron as not according to the contract. Now, there are other reasons why they say they have a right to refuse payment, but what I have been talking about is the right to reject on the ground that the tests did not show that the iron complies with the contract as to the sulphur contained. Another question has been suggested and which is independent, I take it, of the quality of the iron. Of course if the quality of the iron did not correspond to the contract, if you find that fact, they would have a right to reject it at the proper time and with proper notice. [It is contended by the defendant that the iron was rejected and that the rejection was acceded to by the plaintiffs, and their claim released as to the defendant company by the offer of the plaintiffs to sell or accept an offer for the iron in dispute made by the Carnegie Company

for $14.00 per ton as it lay in the yard, the Carnegie Company having become at the time, or about that time, the purchaser of the plant of the defendant company, if I understand the testimony. Now, in a general way, for I am not giving you the detail of any of this, the plaintiffs say in answer to that that Nimick & Company were on the verge of insolvency at the time and the defendant had disposed of its plant, and in view of the apparent complications in which the sale of the iron was involved, they were willing to settle their claim against the defendant company for $14.00 per ton and accept the offer of the Carnegies. That will rest with you to determine under all the evidence the merits of the respective contentions of the parties. It may have the effect, as you find the facts, of either discharging the defendant from all liability, if that was the purpose of it between these parties, or reducing the claim of the plaintiffs to $14:00 per ton for the iron, or have no effect upon their claim as against the defendant. That is what it may do ; you will have to say what it does do. It becomes a matter for you to determine in order to reach a true verdict.] [8]

Now, the counsel for the litigants have thoroughly discussed the testimony in detail on all the questions in dispute—whether it was a delivery or not. If defendant had a right from the defective character of the iron to reject it, then there could not be any recovery, and it had a right to reject it if it did not come up to the standard of the article which it had purchased, but I have not touched on that very much; counsel have given you their views about that; whether there was delivery or not.

[The lot of iron came from Sharpsville in Mercer county and was shipped according to agreement and was in the cars. I wouldn't say that they couldn't analyze it on the cars, or couldn't analyze it off the cars and hold it in the yards, because it is a bulky article, and the cars might be demanded elsewhere. I leave that question as to whether or not it was a delivery and acceptance, and whether, after everything was settled properly and reasonably between them, that they long afterwards disputed it. The law of the case is not difficult to determine. It is a question as to whether the facts of the case bring it within the rules of the law.] [9]

Now, as I say, it has been so thoroughly discussed that I deem it unnecessary that I should add anything further. [You will

bear in mind that I have not intended to control you in your conclusions, either as to the facts to be found from the evidence or as to what the effect of the facts when so found by you from all the evidence may be. You have got the facts and you will have to judge and determine from the facts what the effect of it is upon the question in dispute.] [10]

Verdict and judgment for plaintiffs for $6,783.06. Defendant appealed.

*Errors assigned* among others were (1–10) above instructions, quoting them.

*Johns McCleave*, with him *D. T. Watson*, for appellant.—The mere fact that the subject of the contract is sold by weight, and the value is ascertained by the price per pound, will not render the contract severable. Here there were no distinct items in the subject for delivery, the whole was sold for a certain price per ton, the buyer to pay for a certain number of tons each month. There was no expression as to the number of tons to be delivered per month, or as to when the delivery should be completed: Mining Co. v. Jones, 108 Pa. 66.

Certainly the facts that constitute a delivery and acceptance, or a rejection, are to be determined by the law, and the jury was entitled to have clear instructions as to what conduct constituted a delivery and acceptance, and what conduct constituted a rejection, so that they could intelligently apply the law to the facts as developed by the evidence, but in this charge the law governing the rights of the parties was in no place stated or explained, but it was left to the jury, over and over again, to find both the law and the facts as they might think right between the parties.

*W. B. Rodgers*, for appellees.

OPINION BY MR. JUSTICE GREEN, January 3, 1898:

As it seems to us, the controlling question in this case is whether there was an acceptance or rejection of the iron by the defendant. The defendant's order to Nimick & Co. was entered on or before October 18, 1890, as appears by letter of that date from Nimick & Co. to defendant. The deliveries under the

order were made, October 25, 2 cars; October 27, 2 cars; October 29, 1 car; November 5, 4 cars; November 6, 2 cars, in all 340 tons. The entire delivery was completed at the yard of the defendant company on November 6, 1890. By the terms of the order all the iron delivered in October was to be paid for, one half on November 10, and the other half on November 25. On November 10, the defendant, then being in receipt of all the iron, sent a voucher to Nimick & Co., which embraced all the iron delivered under the order up to that date, deducted the freight which had been paid on all the iron and paid the one half of the price of the iron which was due on November 10. No notice was given by the defendant that any of the iron was rejected for any reason whatever, nor that it was held subject to the order of Nimick & Co. When the voucher was given on November 25, following, credit was claimed for the amount paid at the former settlement, by deducting the number of tons, 340, from an aggregate of 1167 tons which had been settled for by the previous voucher, and crediting Nimick & Co. with only the price of the whole 1167 tons less the 340 tons. All of this appears in a settlement sent by Nimick & Co. to the plaintiffs on November 25, 1890. In this paper no allusion is made to the 340 tons, except as being " tons over limit in sulphur and held subject to our order." There was no statement showing what the analyses were as to sulphur, or that any such tests had been made, and the only communication that was made to the plaintiffs was from Nimick & Co. in the manner stated. No information was given as to what had been done with the iron, and nothing was said as to whether it had been rejected. Charles H. Scott, the bookkeeper of Nimick & Co., who conducted the transaction and attended to the books and correspondence of the firm, and was the principal witness for the defendant, after having testified that the terms of sale required the payment of one half the price of the iron on the 10th and the other half on the 25th of the month following the delivery, was asked on cross-examination, " Q. And according to these vouchers and according to these payments, the defendant in this case paid the first payment, the one half of the cost of this iron in controversy on the 10th of October (November)? A. Yes, sir. Q. Without any objection as to the quality of the iron. And was there a word said by them, any complaint

made by them as to the quality of that iron until the 25th of November? A. I never heard of any." The witness further testified that he did not receive the analysis till some time after November 25, though he asked for it several times, but the first correspondence in regard to it did not take place till March 4, 1891, and that was a letter from Nimick & Co. to plaintiffs, in which they reported an offer of $15.00 per ton for the iron from Carnegie & Co. The other testimony showed that when the iron was received by the defendant it was sampled and analyzed, and was then unloaded on the defendant's property. They alleged that it was held subsequently to that subject to the order of Nimick & Co. The defendant does not appear to have sent any word or notice of any kind to the plaintiffs in regard to the iron, and their communications were only with Nimick & Co. It was not until March 12, following, that plaintiffs received the analysis of the iron. On the other hand the defendant contends and gave evidence to prove that he had the iron analyzed as soon as it arrived, and when the report of the analysis came in they unloaded the iron and piled it up by itself, and thereafter they held it subject to the order of Nimick & Co.

It will be seen at once that a most serious question as to the acceptance or rejection of the iron by the defendant was raised. The court submitted this question to the jury who found for the plaintiffs, and, therefore, must necessarily have found that the iron was accepted. Of course, if such was the fact the liability of the defendant followed. In reviewing the action of the court on this subject and the comments contained in the charge, we do not discover any error. After explaining the subject of delivery in the aspects developed by the testimony, and the right of the defendant to reject the iron if it was not up to the standard of the contract, and the effect of some correspondence in regard to a subsequent sale of it, and of the action of the plaintiffs in relation thereto, the court said to the jury, "I say I leave to you to determine whether it was a delivery and an acceptance or a rejection. The lot of iron came from Sharpsville in Mercer county, and was shipped according to agreement, and was in the cars. I wouldn't say that they couldn't analyze it on the cars, or couldn't analyze it off the cars, and hold it in the yards, because it is a bulky article, and the cars might be demanded elsewhere. I leave that question

as to whether or not it was a delivery and acceptance, and whether after everything was settled properly and reasonably between them, that they long afterwards disputed it." This was really the leading and most important question in the cause. It was also a controlling question, because if there was a delivery and acceptance the defendant's liability resulted as a matter of law.   A considerable part of the testimony related to the chemical analyses of the iron, but the testimony on that subject was very conflicting, and was not at all satisfactory. The variations in the results reached were very confusing, and as this whole matter related to the right of the defendant to reject the iron, rather than to the question whether they did reject it in fact, the subject was of minor importance as contrasted with the other question whether they did actually reject or accept this iron.   We think there was ample testimony to sustain a verdict for the plaintiffs on this subject, and hence we do not feel disposed to question its propriety, or to resist the logical consequence of the finding.   It is a question of fact, and the verdict disposes of it.   While there are some things in the charge which are fairly subject to criticism we do not think they are of sufficient consequence to affect the result.   The assignments of error are not sustained.

Judgment affirmed.